```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF VIRGINIA
                    Richmond Division
```

UNITED STATES OF AMERICA

v.                                      Criminal No. 3:25-cr-114

RAYKWAN JERMAN BRANCH
     Defendant.

MEMORANDUM OPINION

This matter is before the Court on MR. BRANCH'S MOTION TO SUPPRESS EVIDENCE ("Motion to Suppress") (ECF No. 14), the RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS (ECF No. 17), and MR. BRANCH'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS MOTION TO SUPPRESS EVIDENCE (ECF No. 18). For the reasons set forth below, the Motion to Suppress will be DENIED.

I. PROCEDURAL BACKGROUND

In July 2025, a grand jury returned the INDICTMENT (ECF No. 1) that charged Raykwan Jerman Branch ("Branch") with one count of Possession of a Firearm by a Convicted Felon ("COUNT 1"). ECF No. 1. On August 27, 2025, Branch filed his Motion to Suppress. ECF No. 14. On October 6, 2025, the Court held an evidentiary hearing on the Motion to Suppress, during which Henrico County Police Department Officers Rose and Maxwell as well as Richmond Police Department Officer Goins testified. The facts pertaining to the Motion to Suppress, as established by a preponderance of the evidence, are as follows.

## II. FACTUAL BACKGROUND

At approximately 12:00 P.M. on April 10, 2025, Richmond Police Department ("RPD") officers were patrolling near a convenience store called "Mega Bodega" on the south side of Richmond, Virginia. ECF No. 14 at 1. The store was under surveillance by RPD officers. The patrolling RPD officers saw a light-colored SUV parked in the store's side parking lot with two black men sitting in the front seats. ECF No. 14 at 1. The man who had been sitting in the driver's seat of the SUV then walked into the store while Branch remained in the passenger seat. ECF No. 14 at 1, 3. The RPD officers did not know the driver of the vehicle, but they were informed by the Henrico County Police Department ("HCPD") officers that there was an outstanding arrest warrant for him for a robbery.[1] ECF No. 14 at 1.

The RPD and HCPD officers then walked into the Mega Bodega to arrest the driver of the SUV on the outstanding warrant. ECF No. 14 at 2. The driver was arrested, placed in handcuffs, and was thereafter nowhere near the SUV. ECF No. 14 at 2. After the driver was arrested on the outstanding warrant, two RPD officers, Officers Goins and Burgess, "went to the SUV to 'secure' it 'in[] case Henrico needed it for their investigation.'" ECF No. 14 at 2

---

[1] The driver was wanted for a robbery involving a firearm and theft of a wallet, computer bag, and several other personal items. ECF No. 17 at 2.

(citing Discover at 19) (emphasis in original) (alterations in original).

When the police officers approached the car, Branch was sitting in the SUV's front passenger seat with his cell phone in his lap and a cigarette in his hand. ECF No. 14 at 3. The officers began talking to Branch, and Branch rolled down the passenger-side car window. ECF No. 14 at 3. The RPD officers interacting with Branch did not know Branch and had no reason to suspect that he had committed any crime. ECF No. 14 at 3. During the interaction, Officer Goins asked Branch to step out of the car multiple times. After Branch repeatedly questioned why he was being asked out of the car, Officer Goins eventually responded, "[a]lright, so this car is going to be part of an investigation potentially, so I just got to secure it to make sure. Because if it's getting towed under the investigation, we're just securing it." ECF No. 14 at 3.

At this point, three officers were surrounding the car and Officer Burgess had already reached through the driver-side window and removed the keys from the ignition.[2] ECF No. 14 at 4. As Branch continued to ask the officers why he had to get out of the car, Officer Goins reached for the front passenger-side door handle and opened the car door from the outside. ECF No. 14 at 4. When Officer

---

[2] It appears from the body camera footage that Branch looked over and saw Officer Burgess take the car keys out of the ignition. Officer Goin Body-Worn Camera Footage, Ex. J, at 00:42-00:49.

Goins opened the car door, the officers could see the right side of the seat where Branch was sitting and observed that Branch had a handgun tucked under his right leg. ECF No. 14 at 4. The officers then arrested Branch, searched him incident to arrest, and found a small quantity of suspected drugs on Branch's person. ECF No. 14 at 4.

Branch now seeks to suppress evidence of the firearm and suspected drugs obtained after this allegedly illegal seizure in violation of his Fourth Amendment rights.

### III. STANDARD OF REVIEW

A. Applicable Law

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. CONST. amend. IV. Accordingly, the default rule is that law enforcement must obtain a warrant, grounded in probable cause, before seizing or searching individuals. United States v. Yengel, 711 F.3d 392, 396 (4th Cir. 2013). There are, however, several exceptions to the warrant requirement. United States v. Curry, 965 F.3d 313, 321 (4th Cir. 2020), as amended (July 15, 2020), as amended (July 16, 2020). One such exception relevant to this case is the plain view doctrine. Where law enforcement seize or search an individual without a warrant and under circumstances in which no exception to the warrant requirement applies, the Fourth Amendment is violated, and

the evidence found as a result of the violation must be suppressed. Wong Sun v. United States, 371 U.S. 471, 484-85, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

The so-called "plain view" exception is at issue here. United States v. Runner, 43 F.4th 417, 421 (4th Cir. 2022). For the plain view exception to apply, "the government must show that: '(1) the officer [was] lawfully in a place from which the object [could] be plainly viewed; (2) the officer ha[d] a lawful right of access to the object itself; and (3) the object's incriminating character [wa]s immediately apparent.'" Id. (quoting United States v. Jackson, 131 F.3d 1105, 1109 (4th Cir. 1997)) (alterations in original).

IV. ANALYSIS

A. Branch's Standing in the SUV

The parties dispute whether Branch had a legitimate and reasonable privacy interest in the SUV that would suffice to give him standing to challenge any search or seizure involving the SUV.

A person who makes a motion to suppress evidence must show he was "a victim of a search or seizure . . . as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." Jones v. United States, 362 U.S. 257, 261, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960), overruled on other grounds by United States v. Salvucci, 448 U.S. 83, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980).

In other words, a person may only move to suppress to vindicate his own legitimate and reasonable interest in privacy. Rakas v. Illinois, 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978).

In this case, the scope of Branch's reasonable and legitimate expectation of privacy, and hence his standing to challenge the seizure of the SUV, depends on his connection, if any, to the SUV. Here, Branch was a passenger in the parked SUV, and there is no indication in the record that Branch has any ownership, possessory, or property interest in the vehicle. "A passenger in a car normally has no legitimate expectation of privacy in an automobile in which he asserts neither a property interest nor a possessory interest and where he disclaims any interest in the seized object." United States v. Carter, 300 F.3d 415, 421 (4th Cir. 2002) (citing Rakas, 439 U.S. at 148-49). Branch asserts that the SUV was seized when Officer Goins opened the front passenger door. But, under Rakas, Branch lacks standing to challenge that seizure (if it was one).

Branch's reliance on United States v. Avagyan, 164 F. Supp. 3d 864 (E.D. Va. 2016), aff'd sub nom. United States v. Ghazaryan, 685 F. App'x 222 (4th Cir. 2017), to establish that he has standing falls short. ECF No. 18 at 1. Avagyan makes clear that "any occupant of a stopped car is stopped himself such that he has standing to challenge both (1) the legality of the stop and (2) the search/seizure of his person; however, an occupant of a stolen vehicle lacks standing to challenge the search of the car."

Avagyan, 164 F. Supp. 3d at 879 (internal citations omitted). In this case, the condition precedent to the principles applied in Avagyan has not been satisfied because the SUV was not "stopped" by the officers. See id.

The Supreme court has held that, when a car is stopped, all passengers are stopped and have standing to challenge the constitutionality of their stop. Brendlin v. California, 551 U.S. 249, 251, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007). A passenger's standing to challenge the stop of a car is rooted in that passenger's interest in his own person rather than the passenger's (non-existent) possessory interest in the car. Avagyan, 164 F. Supp. 3d at 880. However, Branch's situation is factually distinct. This was not a traditional traffic stop where the passenger is seized along with the car during the stop. Branch was seated in the front passenger seat of a parked car outside of a bodega. The officers approached the vehicle on foot and merely requested that Branch exit the SUV so that the officers could secure the vehicle. The car was never stopped in response to officers exerting force or influence upon Branch or the SUV. Therefore, because the car was not the subject of a stop, Branch's interest in his own person is not implicated and, in turn, Branch lacks standing to challenge any search or seizure of the SUV.

B. Moment of Seizure

Of course, wholly apart from the seizure of the SUV, Branch

can challenge the seizure of his person. The issue is to determine at what moment Branch was seized because it is at that moment of seizure that reasonable suspicion must exist. United States v. Fuller, No. 3:25-cr-30, 2025 U.S. Dist. LEXIS 158918, at *17 (E.D. Va. Aug. 15, 2025); see, e.g., United States v. Peters, 60 F.4th 855, 862 (4th Cir. 2023) ("[W]e must first establish when he was seized, and then determine if reasonable suspicion justified the seizure.").

"A seizure, as understood under the Fourth Amendment, occurs '[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" Peters, 60 F.4th at 862 (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). "This is measured by whether, 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" Peters, 60 F.4th at 862 (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980) (plurality opinion)). A "seizure," occurs when an officer employs "'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." Torres v. Madrid, 592 U.S. 306, 311, 141 S. Ct. 989, 209 L. Ed. 2d 190 (2021) (alteration in original) (quoting Terry, 392 U.S. at 19 n.16).

Based upon the facts and evidence presented in this case, Branch was not seized before the firearm was discovered. A person

is seized when, "by means of physical force or show of authority," an officer terminates or restrains his freedom of movement. Fla. v. Bostick, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991). However, there is no seizure "without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." Brendlin, 551 U.S. at 254 (citing California v. Hodari D., 499 U.S. 621, 626 n.2, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)). The question is, in view of all the circumstances, whether "a reasonable person would have believed that he was not free to leave." Mendenhall, 446 U.S. at 554. Some factors that may influence whether a reasonable person would feel free to disregard the police and go about his business include:

> (1) the defendant's un-coerced consent; (2) the location of the interaction; (3) how closed off or isolated the defendant and officer are at the time of the stop; (4) whether the officer brandished a weapon; (5) whether the officer used threats or commands or an authoritative tone of voice; (6) whether the officer used intimidating movements; (7) whether the officer used force; and (8) whether the interaction took place in a public location.

Avagyan, 164 F. Supp. 3d at 883 (citing United States v. Drayton, 536 U.S. 194, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002)).

Here, the location of the interaction was a public parking lot of a bodega around 12:00 P.M. At the time of the encounter, there were at least five other people located in the grassy area directly behind where the SUV was parked. Before discovery of the firearm, no weapons were brandished by the officers. As Officer

Goins spoke to Branch, the interaction remained professional and respectful. No threats, commands, intimidating movements, or force were employed before the officers saw the firearm.

Additionally, the officers approached Branch and the SUV on foot. At no point was there ever any indication from the officers that Branch was the target of any police efforts or investigation. On the contrary, the officers were merely requesting that Branch exit the vehicle so they could secure the vehicle in case the HCPD needed the SUV for its investigation. A review of the body camera footage reveals it was only after the officer opened the passenger-side door and saw the firearm that Officer Goins reached into the SUV to secure Branch.[3]

Viewed as a whole, the totality of the circumstances as they existed right before the firearm was discovered demonstrate that (1) the officers never indicated Branch was the subject of any investigation; (2) Officer Goins clearly, and in a civil, unthreatening way explained to Branch that they simply wanted Branch out of the SUV so the officers could secure the vehicle for a potential investigation; (3) no weapons were drawn; (4) the

---

[3] "After several statements refrains between the officers and the defendant, one of the RPD officers opened the front passenger door to the SUV, the officers immediately saw that the defendant was seated upon a firearm. In response, one of the officers stated, 'He got a firearm, firearm, firearm, firearm.' See U.S. Ex. 1 (Officer Gayles Body-Worn Camera). One of the RPD officers then grabbed the defendant's arms and removed him from the SUV. The RPD officers seized the firearm." ECF No. 17 at 2.

activity was public; (5) Branch was not isolated; and (6) neither the removal of the keys nor the opening of the car door was force directed at Branch. Therefore, Branch does not have independent grounds to assert that he was seized before the discovery of the firearm in order to implicate his own Fourth Amendment rights.[4]

Branch argues that he was seized before the discovery of the firearm. However, the evidence does not support that assertion. It is correct that there were three police officers at the vehicle, and that one of them turned off the car and removed the keys from the ignition, and that Officer Goins requested that Branch exit the SUV and opened the passenger door. But Officer Goins made clear why Branch was being ordered to get out of the vehicle, namely, to secure the SUV for potential inspection. At no point did the officers indicate that Branch was not free to leave upon exiting the vehicle.

As to the out-of-circuit cases cited by Branch, Branch's situation is distinguishable. ECF No. 18 at 4. Branch cites multiple cases to support the proposition that when Officer Goins asserted control over the door or window of the SUV, a seizure under the Fourth Amendment had occurred before the discovery of

---

[4] Where "physical force is absent, a seizure requires both a 'show of authority' from law enforcement officers and 'submission to the assertion of authority by the [individual]." United States v. Stover, 808 F.3d 991, 995 (4th Cir. 2015) (quoting Hodari D., 499 U.S. at 626).

the firearm. However, (1) as previously explained, Branch lacks standing to challenge any independent seizure of the SUV and (2) the holdings from these cases are inapplicable to Branch's situation because the factual scenarios are inapposite. See, e.g., United States v. Morgan, 71 F.4th 540 (6th Cir. 2023) (finding that opening a door <u>without any warning</u> to check on a driver in a vehicle in the course of "community caretaking" constitutes a search); United States v. Brown, 334 F.3d 1161 (D.C. Cir. 2003) (assuming "that the opening of the car door constituted both a stop and a search for Terry purposes" in the context of an investigatory stop of a suspicious vehicle the officers believed may have been involved in a shooting in the parking lot where the vehicle was parked); United States v. Ngumezi, 980 F.3d 1285 (9th Cir. 2020) (addressing a situation where the officer opened the door <u>and leaned in across the plane of the door</u> to obtain information, finding that to be a search).

In support of Branch's second argument (whether Branch himself was seized when the police surrounded the car and asked Branch to exit the vehicle),[5] he cites United States v. Hester, 910 F.3d 78 (3d Cir. 2018). In Hester, four uniformed officers approached two individuals in a parked car, instructed the driver

---

[5] See ECF No. 18 at 4-5.

to turn the car off, and ordered them to get out of the car. Id. at 82-83. The car was illegally parked in front of a corner store with a known history of drug-related activity in a high-crime area. Id. The driver admitted she did not have a driver's license and that the car was not registered in her name. Id. The Hester court then concluded that, in addition to the driver, the police had seized the passenger by means of a show of authority because the passenger would not have "felt free 'to ignore the police presence and go about his business.'" Id. at 86 (quoting Bostick, 501 U.S. at 437). Hester is simply too factually distinct to control the outcome in Branch's case. The totality of the circumstances here show that Branch was free to leave. In fact, he was being invited to leave and, as part of that process, Officer Goins opened the car door.

C. Application of Plain View Doctrine to the Firearm

For the plain view exception to apply to the firearm, "the government must show that: '(1) the officer [was] lawfully in a place from which the object [could] be plainly viewed; (2) the officer ha[d] a lawful right of access to the object itself; and (3) the object's incriminating character [wa]s immediately apparent.'" Runner, 43 F.4th at 421 (quoting Jackson, 131 F.3d at 1109) (alterations in original).

There being no Fourth Amendment violation before the discovery of the firearm, Officer Goins was therefore lawfully in

a place from which the firearm could be plainly viewed. Once Officer Goins saw the firearm, he clearly had a lawful right of access to the firearm itself, and the firearm's incriminating character was indeed immediately apparent upon discovery. Therefore, the plain view doctrine authorized seizure of the firearm. Once the firearm was discovered, the officers were justified in seizing Branch. In turn, the subsequent search of Branch, which yielded the suspected drugs, should not be excluded because it was a legitimate search incident to a lawful arrest that occurred after Branch had acknowledged he was a convicted felon. ECF No. 17 at 2.

## V. CONCLUSION

For the foregoing reasons, MR. BRANCH'S MOTION TO SUPPRESS EVIDENCE (ECF No. 14) will be DENIED as to the suppression of the firearm and suspected drugs.

/s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: November 3, 2025